# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **AGUA CALIENTE BAND OF CAHUILLA INDIANS, et al.,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**STEVEN MNUCHIN, in his official capacity as Secretary of the Treasury,**<br><br>**Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)    **Case No. 20-cv-01136 (APM)**<br>)<br>)<br>)<br>)<br>)<br>) |

## <u>MEMORANDUM OPINION AND ORDER</u>

For the second time in as many weeks, the court confronts a challenge to the Secretary of the Department of the Treasury's ("Secretary") disbursement of emergency funds to Tribal governments under Title V of the Coronavirus Aid, Relief, and Economic Security Act, or CARES Act. In the CARES Act, Congress set aside $8 billion in emergency aid for "Tribal governments" to address the COVID-19 pandemic, and it required the Secretary to disburse those funds "not later than 30 days after March 27, 2020"—that is, by April 26, 2020. 42 U.S.C. § 801(b)(1).

This court previously reviewed a challenge brought by various Indian tribes posing the question of *who* is eligible to receive Title V emergency funds. *See Confederated Tribes of the Chehalis Reservation et al. v. Mnuchin*, Case No. 20-cv-01002 (APM). Now, a different group of Indian tribes challenges *when* the Secretary intends to disburse the funds. When Plaintiffs initially filed this lawsuit on April 30, 2020, the Secretary had not disbursed any emergency funds to any Tribal government. Since then, however, he has disbursed 60% of the $8 billion Congress set aside for them. Notwithstanding this partial disbursement, Plaintiffs move for a temporary

restraining order, preliminary injunction, and emergency writ of mandamus directing the Secretary to immediately disburse all CARES Act funds to Plaintiffs and other Tribal governments.

As explained more fully below, the court denies Plaintiffs' motion without prejudice. Undoubtedly, the COVID-19 pandemic presents a national public health emergency that is without precedent in modern times, and the Title V funds at issue are clearly needed by Indian tribes to combat the pandemic's effects. Plaintiffs, however, have not carried their burden to show that the Secretary's delay thus far is so egregious as to warrant mandamus relief today. But that does not mean the Secretary enjoys an indefinite period to carry out Congress's command. This matter remains pending, and Plaintiffs are free to renew their motion should the Secretary continue to delay in distributing the remaining emergency funds.

## I.

### A.    Background

#### 1.    *The CARES Act*

Congress enacted the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act" or "Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020), to respond to the devastating impacts of the COVID-19 pandemic. Title V of the Act appropriates $150 billion for fiscal year 2020 for "payments to States, Tribal governments, and units of local government," 42 U.S.C. § 801(a)(1), with $8 billion of that sum "reserve[d] . . . for making payments to Tribal governments." *Id.* § 801(a)(2)(B). The Act requires the Secretary of the United States Department of the Treasury to disburse the Title V funds to Tribal governments "not later than 30 days after March 27, 2020"— that is, by April 26, 2020. *Id.* § 801(b)(1). The Act further instructs that the funds are intended:

> to cover only those costs of the State, Tribal government, or unit of
> local government that – (1) are necessary expenditures incurred due
> to the public health emergency with respect to the Coronavirus
> Disease 2019 (COVID-19); (2) were not accounted for in the budget

most recently approved as of enactment of this section for the State or government; and (3) were incurred during the period that begins on March 1, 2020, and ends on December 30, 2020.

*Id.* § 801(d).

### 2. *Factual and Procedural Background*

On April 13, 2020, the Secretary published on the Treasury Department's website a form titled "Certification for Requested Tribal Data" ("Certification"), asking that eligible Tribal governments submit certain data by April 17, 2020, to effectuate the disbursement of CARES Act funds. *See Confederated Tribes of the Chehalis Reservation v. Mnuchin*, Case No. 20-cv-01002 (APM), Case No. 20-cv-01059 (APM), Case No. 20-cv-01070 (APM), 2020 WL 1984297, at *3 (D.D.C. Apr. 27, 2020)[1]; Am. Compl., ECF No. 11, at ¶¶ 26–27.  Plaintiffs in this case—the Agua Caliente Band of Cahuilla Indians, the Ak-Chin Indian Community, the Arapaho Tribe of the Wind River Reservation, the Cherokee Nation, the Chickaw Nation, the Choctaw Nation of Oklahoma, the Snoqualmie Indian Tribe, and the Yurok Tribe of the Yurok Reservation ("Plaintiffs")— submitted the required certifications before the April 17, 2020, deadline.  *See* Am. Compl. at ¶ 27.

Despite having collected data that he said would aid in the allocation and distribution of Title V funds, the Secretary missed the April 26, 2020, payment deadline.  *Id.* ¶ 4.  Plaintiffs filed

---

[1] The Certification sought the following information:

    (1)    "Name of Indian Tribe";
    (2)    "Population," defined as "Total number of Indian Tribe Citizens/Members/Shareholders, as of January 1, 2020";
    (3)    "Land Base," defined as "Total number of land acres held by the Indian Tribe and any tribally-owned entity (to include entities in which the Indian Tribe maintains at least 51% ownership) as of January 1, 2020" noting that such lands would "include lands held in trust by the United States, owned in restricted fee status, owned in fee, or selected pursuant to the Alaska Native Claims Settlement Act";
    (4)    "Employees," defined as "Total number of persons employed by the Indian Tribe and any tribally-owned entity (to include entities in which the Indian Tribe maintains at least 51% ownership) on January 1, 2020"; and,
    (5)    "Total expenditures for the most recently completed fiscal year."

*Confederated Tribes*, 2020 WL 1984297 at *3.

this suit four days later, on April 30, 2020, *see* Compl., ECF No. 1, asserting claims under the Administrative Procedure Act, 5 U.S.C. §§ 701-706, and the Mandamus Act, 28 U.S.C. § 1361, *id.* ¶ 6.   Plaintiffs filed a Motion for a Temporary Restraining, Preliminary Injunction, and Emergency Writ of Mandamus the following day, *see* Pls.' Mot. for TRO, Prelim. Inj., and Emergency Writ of Mandamus, ECF No. 4, and amended the motion to add Plaintiffs Chickasaw Nation and Choctaw Nation of Oklahoma on May 3, 2020, *see* Pls.' Am. Mot. for TRO, Prelim. Inj., and Emergency Writ of Mandamus, ECF No. 12 [hereinafter Pls.' Mot.].   Plaintiffs assert that the Secretary's failure to act by the statutory deadline justifies an order of injunctive relief or writ of mandamus "directing the Secretary to <u>immediately</u> disburse" the Title V funds as directed by Congress.  *Id.* at 3, 14.

Before briefing on Plaintiffs' motion concluded, the Secretary started making payments to Tribal governments.   On May 5, 2020, the Secretary announced that he would immediately begin to distribute $4.8 billion, or 60%, of the appropriated emergency funds to Tribal governments. *See* U.S. DEP'T OF TREASURY, Coronavirus Relief Fund Allocations to Tribal Governments (May 5, 2020), at 2.[2]   The Secretary explained that the Treasury Department "ha[d] determined to distribute 60 percent of the $8 billion reserved for Tribal governments immediately based on population."   *Id.*   The population data came from the Department of Housing and Urban Development's Indian Housing Block Grant program, not from the agency's own data collection efforts.  *Id.*

The Secretary offered no target date by which he would distribute the balance of the Title V funds.  *See generally id.*  He indicated, however, that the remaining allocation would be "based on employment and expenditures data of Tribes and tribally-owned entities," and that the agency

---

[2]        Available       at       https://home.treasury.gov/system/files/136/Coronavirus-Relief-Fund-Tribal-Allocation-Methodology.pdf.

"intends to request additional information in the near future from Tribal governments as to their employment and expenditures." *Id.* at 2.   The Secretary stated that he would disburse the remaining funds "after data on employment and expenditures are received, reasonably verified, and accounted for in the allocation formula." *Id.*

The Secretary filed his opposition to Plaintiffs' emergency motion the day after he began disbursing funds.   *See* Def.'s Opp'n to Pls.' Am. Mot. for TRO and Prelim. Inj., ECF No. 26 [hereinafter Def.'s Opp'n].   The court heard argument on Plaintiffs' motion on May 8, 2020. *See* 1:20-cv-01136 (APM), Minute Entry, 5/8/2020.

## II.

Preliminary injunctive relief is an "extraordinary and drastic remedy" that is "never awarded as [a matter] of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citations and internal quotation marks omitted).   A court may only grant the "extraordinary remedy . . . upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). Specifically, Plaintiffs must show that they are: (1) "likely to succeed on the merits"; (2) "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [their] favor"; and (4) "an injunction is in the public interest." *Winter*, 555 U.S. at 20 (citations omitted).   Where the federal government is the opposing party, the balance of equities and public interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

Courts in the D.C. Circuit evaluate the four preliminary injunction factors on a "sliding scale"—if a "movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Davis v. Pension Benefit Guar. Corp*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009).   Though the Supreme Court's decision in *Winter*

*v. Natural Resources Defense Council* cast some doubt on this approach, *see Davis*, 571 F.3d at 1296 (Kavanaugh, J., concurring) ("[T]he old sliding-scale approach to preliminary injunctions—under which a very strong likelihood of success could make up for a failure to show a likelihood of irreparable harm, or vice versa—is no longer controlling, or even viable." (internal quotation marks and citation omitted)), absent a D.C. Circuit or Supreme Court decision overruling it, the sliding scale framework remains binding precedent that this court must follow, *see Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018) (explaining that the D.C. Circuit "has not yet decided whether *Winter* . . . is properly read to suggest a 'sliding scale' approach to weighing the four factors be abandoned"); *United States v. Torres*, 115 F.3d 1033, 1036 (D.C. Cir. 1997) ("[D]istrict judges, like panels of [the D.C. Circuit], are obligated to follow controlling circuit precedent until either [the D.C. Circuit], sitting en banc, or the Supreme Court, overrule it.").

Accordingly, a plaintiff seeking preliminary injunctive relief "must make a 'clear showing that four factors, taken together, warrant relief.'" *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016)). Though plaintiffs are not absolved of their burden to make an independent showing on each of the four factors, the sliding scale approach "allow[s] that a strong showing on one factor could make up for a weaker showing on another." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). "It is in this sense that all four factors 'must be balanced against each other.'" *Davis*, 571 F.3d at 1292 (quoting *Davenport  v. Int'l Bhd. of Teamsters, AFL-CIO*, 166 F.3d 356, 360–61 (D.C. Cir. 1999)). The weighing of the four factors is within the district court's discretion. *See id.* at 1291.[3]

---

[3] Defendant insists that Plaintiffs must satisfy an even higher burden of showing a clear entitlement to relief or "extreme or very serious damage will result from the denial of the injunction," because they seek a mandatory injunction—that is, an order requiring positive agency action that changes the status quo. *See* Def.'s Opp'n at 5 (quoting *Singh v. Carter*, 185 F. Supp. 3d 11, 17 (D.D.C. 2016)). The court need not decide whether a mandatory

### III.

The court begins and ends its analysis with the "most important factor"—Plaintiffs'
likelihood of success. *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014); *see also Guedes
v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 10 (D.C. Cir. 2019)
("A foundational requirement for obtaining preliminary injunctive relief is that the plaintiffs
demonstrate a likelihood of success on the merits."). Plaintiffs have not demonstrated a likelihood
of success on their claims for judicial intervention—at least not now.

### A.

Plaintiffs rest their demand for equitable relief on two statutes—section 706(1) of the
Administrative Procedure Act ("APA") and the Mandamus Act. *See* Am. Compl. ¶¶ 30–39. The
former authorizes courts to "compel agency action unlawfully withheld or unreasonably delayed."
5 U.S.C. § 706(1). The latter empowers courts "to compel an officer or employee of the United
States or an agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. Defendant
asserts that the court lacks subject matter jurisdiction under the Mandamus Act, because the APA
supplies Plaintiffs an adequate remedy. *See* Def.'s Opp'n at 7 (citing *Navajo Nation v. Azar*, 302
F. Supp. 3d 429, 436 n.4 (D.D.C. 2018)); *Hamandi v. Chertoff*, 550 F. Supp. 2d 46, 53 (D.D.C.
2008)); *see also Baptist Mem'l Hosp. v. Sebelius*, 603 F.3d 57, 62 (D.C. Cir. 2010) (stating that
mandamus relief is available under § 1361 only if, among other things, "there is no other adequate
remedy available to plaintiff"). Plaintiffs disagree. *See* Pls.' Reply in Supp. of Pls.' Mot., ECF
No. 27 [hereinafter Pls.' Reply], at 4 n.4. The court need not, however, resolve this jurisdictional
question. The parties agree that the court possesses jurisdiction under the general federal question

---

injunction demands a greater showing, *see Singh*, 185 F. Supp. 3d at 17 n.3 (observing that the D.C. Circuit has not
opined on a heightened standard for mandatory injunctive relief), because Plaintiffs have not satisfied the less stringent
standard for prohibitive injunctive relief.

statute to resolve the APA claim, 28 U.S.C. § 1331, *see Trudeau v. FTC*, 456 F.3d 178, 185 (D.C. Cir. 2006), and that the governing standards under § 706(1) of the APA and the Mandamus Act are "essentially the same," *see* Def.'s Opp'n at 7 (quoting *Vietnam Veterans of Am. v. Shinseki*, 599 F.3d 654, 659 n.6 (2010)); Pls.' Reply at 4 n.2; *see also Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 670 (D.C. Cir. 2016) (observing that the APA in § 706(1) "'carried forward'" the "common law writ of mandamus" (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004))).  So, for present purposes, the court need only evaluate whether Plaintiffs are likely to succeed on their APA claim.

## B.

The court easily disposes of Plaintiffs' lead argument, which is that the Secretary's failure to meet the 30-day statutory deadline, by itself, violates the APA and justifies relief.  *See* Pls.' Mot. at 4–5; 5/8/2020 Draft Hr'g Tr. at 7–8.  That argument is squarely foreclosed by Circuit precedent.  *See In re Barr Labs., Inc.*, 930 F.2d 72, 75 (D.C. Cir. 1991) ("[A] finding that delay is unreasonable does not, alone, justify judicial intervention."); *see also Cobell v. Norton*, 240 F.3d 1081, 1096 (D.C. Cir. 2001) (citing *In re Barr Labs.* in the context of a § 706(1) claim).  In *In re Barr Labs.*, the court held that "[e]quitable relief, particularly mandamus, does not necessarily follow a finding of a violation: respect for the autonomy and comparative institutional advantage of the executive branch has traditionally made courts slow to assume command over an agency's choice of priorities."  930 F.2d at 74; *see also Cobell*, 240 F.3d at 1096.  Thus, in an unreasonable delay case, the court must ask "not whether [the agency's] sluggishness has violated a statutory mandate . . . but whether [the court] should exercise [its] equitable powers to enforce the deadline." *In re Barr Labs.*, 930 F.2d at 74.

For their part, Plaintiffs rely on out-of-Circuit cases to support the proposition that, once agency delay is deemed unreasonable, the APA requires courts to compel agency action.  *See* Pls.' Reply at 4 n.4 (citing *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1191 (10th Cir. 1999); *South Carolina v. United States*, 243 F. Supp. 3d 673, 682–95 (D.S.C. 2017)); 5/8/2020 Draft Hr'g Tr. at 7–8.  To state the obvious, those cases are not binding on this court; the court must follow the dictates of the D.C. Circuit.  The Secretary's mere failure to distribute the full CARES Act allocation to Tribal governments in 30 days therefore does not, by itself, merit compelling agency action.

## C.

With the lead question resolved, the court turns to the heart of the matter.  "Resolution of a claim of unreasonable delay is ordinarily a complicated and nuanced task requiring consideration of the particular facts and circumstances before the court."  *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1100 (D.C. Cir. 2003).  The D.C. Circuit has directed that, for such claims, courts must evaluate the six factors set forth in *Telecommunications Research & Action Center v. FCC* (*TRAC*):

> (1) the time agencies take to make decisions must be governed by a "rule of reason"; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

750 F.2d 70, 80 (D.C. Cir. 1984) (cleaned up); *see also Mashpee Wampanoag*, 336 F.3d at 1100 (applying the *TRAC* factors to an unreasonable delay claim under § 706(1)).  The Circuit has

emphasized that the *TRAC* factors are intended to provide guidance—they are not "ironclad"—and that "each case must be analyzed according to its own unique circumstances." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016) (cleaned up).   The "central question" that animates the *TRAC* inquiry is "whether the agency's delay is so egregious as to warrant mandamus." *In re People's Mojahedin Org. of Iran*, 680 F.3d 832, 837 (D.C. Cir. 2012) (internal quotation marks and citation omitted).   Mandamus relief is thus an "extraordinary remedy, reserved only for the most transparent violations of a clear duty to act." *In re Pub. Employees for Envtl. Responsibility*, No. 19-1044, 2020 WL 2090085, at *4 (D.C. Cir. May 1, 2020) (quoting *In re Bluewater Network*, 234 F.3d 1305, 1315 (D.C. Cir. 2000)); *see id.* (observing that mandamus relief is appropriate in the "rare" cases).

### 1.   *TRAC Factors One and Two:  Length of Delay*

The "most important" of the *TRAC* factors are the first two, which concern the length of the agency's delay. *In re People's Mojahedin Org. of Iran*, 680 F.3d at 837 (quoting *In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008)); *see also In re Pub. Employees for Envtl. Responsibility*, 2020 WL 2090085, at *5 ("Time is the '[t]he first and most important factor.'" (alteration in original) (quoting *In re Core Commc'ns*, 531 F.3d at 855)).   The timetable supplied by Congress "may supply content for th[e] rule of reason" by which the agency's delay must be evaluated. *TRAC*, 750 F.2d at 80.

Congress undoubtedly wanted the Secretary to disburse Title V funds quickly.   It directed that the Secretary "shall pay" qualifying Tribal governments "not later than 30 days after" March 27, 2020, or by April 26, 2020. 42 U.S.C. § 801(b)(1).   Setting a specific and brief deadline plainly manifests the urgency with which Congress expected the Secretary to act. *Cf. In re People's*

*Mojahedin Org. of Iran*, 680 F.3d at 837 (observing that the "specificity and relative brevity of the 180-day deadline manifests the Congress's intent that the Secretary act promptly").

Defendant seeks to downplay the imperative nature of the 30-day deadline, asserting that "competing statutory directives" within Title V counsel against treating the "30-day deadline as rigid or absolute, for mandamus purposes." Def.'s Opp'n at 10.  He points out that Congress required him to consult with Indian Tribes and the Secretary of the Interior before making payment to Tribal governments, *see* 42 U.S.C. § 801(c)(7), and that, unlike funding for State and local governments, the statute does not contain a simple formula for allocating the funds, but instead requires the Secretary to devise one, *compare id.* § 801(c)(1), (c)(5) (using relative "population proportion[s]" to allocate funds to State and local governments), *with id.* § 801(c)(7) (stating that allocation for Tribal governments shall be "based on increased expenditures of each such Tribal government . . . relative to aggregate expenditures in fiscal year 2019 by the Tribal government . . . and determined in such manner as the Secretary determines appropriate"). Def.'s Opp'n at 9–10. These are fair points.  To be sure, Congress did make the Secretary's task relatively more difficult with respect to Tribal governments.  "But the Congress undoubtedly knew the enormous demands placed upon the Secretary and nonetheless limited [his] time to [disburse Title V funds] to [30] days." *In re People's Mojahedin Org. of Iran*, 680 F.3d at 837.  The 30-day deadline is therefore not merely aspirational but a date certain by which Congress expected the Secretary to act.

The fact of a missed statutory deadline does not, however, in itself warrant judicial intervention.  The rule of reason demands inquiry into by *how much* the agency missed the deadline.  *See In re Barr Labs.*, 930 F.2d at 74–75.  On this score, Plaintiffs' demand for relief falls short.  On May 5, 2020—the ninth day after the April 26th deadline—the Secretary began disbursing $4.8 billion of the $8 billion in Title V funds to Tribal governments.  Thus, the Secretary

took 30% more time than Congress directed to distribute a majority of the funds.  Plaintiffs have identified no case, and this court has found none, in which a court has interceded and compelled agency action in comparable circumstances.   Indeed, the D.C. Circuit has declined to issue mandamus relief in cases involving far more egregious delay.  *See, e.g., In re Barr Labs*, 930 F.2d at 74 (rejecting mandamus relief where, by the agency's own account, "its expected future delay will range from more than *double* the allotted time to nearly *quadruple*"); *Mashpee Wampanoag Tribal Council*, 336 F.3d at 1097 (declining to compel agency action despite describing the agency's pace as "glacial").  To be fair, those cases do not involve emergency legislation of the kind at issue here.  But, even so, as discussed further below, under a rule of reason, missing a deadline but meeting it in part nine days later does not evince "egregious" agency delay that warrants mandamus relief.

### 2.      *TRAC Factors Three and Five:  Interests Prejudiced by Delay*

Agency delays that may adversely affect the public health and welfare are less tolerated than in the sphere of economic regulation.  *See TRAC*, 750 F.2d at 80.  When "the public health may be at stake, the agency must move expeditiously to consider and resolve the issues before it."  *Pub. Citizen Health Research Grp. v. Comm'r, FDA*, 740 F.2d 21, 34 (D.C. Cir. 1984).   In evaluating the reasonableness of an agency's response in such circumstances, "the court should review the pace of the agency decisional process to ensure that it is not lagging unreasonably in light of the nature and extent of public health considerations."  *Id.*

On the present record, the court is unable to find that the Secretary is "lagging unreasonably" behind in delivering Title V funds to Tribal governments.  The fast-moving spread of COVID-19 and the virus's potentially deadly consequences certainly demand prompt and diligent action by the Secretary.  As Plaintiffs' declarations detail, due to the pandemic, Indian

tribes have been forced to shut down their revenue-producing operations while they have incurred new costs to respond to the virus.  *See* Affidavit of Gary Batton, ECF No. 13, ¶¶ 4–6; Affidavit of Stephen Greetham, ECF No. 14, ¶¶ 6–8; Affidavit of John Plata, ECF No. 15, ¶¶ 5–6, 8; Affidavit of Robert Miguel, ECF No. 16, ¶¶ 5–7; Affidavit of Chuck Hoskin, Jr., ECF No. 17, ¶¶ 4–7; Affidavit of Joseph L. James, ECF No. 18, ¶¶ 5–7; Affidavit of Robert M. de los Angeles, ECF No. 19, ¶ ¶ 5–6, 8; Affidavit of Ryan Ortiz, ECF No. 20, ¶¶ 9–10.  Without full funding, Tribes will be forced to curtail essential government services and lay off or furlough employees.  *See, e.g.*, Batton Decl. ¶ 6; Plata Decl. ¶ 10; Miguel Decl. ¶ 9; Hoskins Decl. ¶ 7; James Decl. ¶¶ 7 –8; de los Angeles Decl. ¶ 11; Ortiz Decl. ¶ 11.  The financial strain is taking a toll, and, as one affiant explains, "reduc[ing] and curtail[ing] essential government services put[s] the health and safety of tribal members at substantial risk."  Ortiz Decl., ¶ 11.

But the Secretary has not been "twiddling his thumbs."  *In re Barr Labs.*, 930 F.2d at 75 (cleaned up).  As detailed in the Declaration of Daniel Kowalski, Counsel to the Secretary who is responsible for disbursing Title V funds, the agency has undertaken significant efforts to meet the deadline imposed by Congress.  *See* Def.'s Opp'n, Decl. of Daniel Kowalski, ECF No. 26-1.  The agency has engaged with Indian tribes, both telephonically and through written comments, as required by the CARES Act, *id.* ¶ 5; solicited information from Indian tribes, and followed up as necessary to verify such information, to assist in determining how to allocate funds, *id.* ¶¶ 6, 8; and "prepare[d] data to run different models in order to determine the formula Treasury will use to allocate payments from the Fund among Tribal governments," *id.* ¶ 9.  Kowalski estimates that he and Treasury staff have spent approximately 2,200 hours on these efforts.  *Id.* ¶ 10.

Plaintiffs are rightly upset that these efforts did not result in timely payments.  As they point out, the 60% distribution made by the agency relied not on data obtained from Indian tribes

in the last few weeks, but on population data from the Department of Housing and Urban Development that was publicly available before the pandemic struck.  *See* Pls.' Reply at 9 n.6. Additionally, the Secretary has indicated that distribution of the remaining 40% will require even more data collection from Indian tribes, with no attendant promise by when the balance will reach Tribal governments.  Over 2,000 hours of labor arguably should have produced better results.  But agency action that fails to achieve optimal output does not automatically justify court intervention. "Egregious" delay is the governing standard, and the Secretary is not there quite yet, even in the midst of a public health crisis.

### 3.    *TRAC Factor Four:  Competing Agency Priorities*

The Secretary does not contend here that the effect of expediting payment of the remaining Title V funds will adversely impact other agency priorities, or that the agency lacks the necessary resources to have taken timely action.  *See* Def.'s Opp'n at 14–15.  Rather, he relies on the agency's efforts to date and says that the missed deadline cannot be attributed to "idleness."  *Id.* at 14.  Fair enough.  But, as discussed, Congress clearly made the disbursement of Title V funds to Tribal governments a top priority.

That said, the Secretary's work to date "is reason for the court to stay its hand for the time being."  *In re Center for Auto Safety*, 793 F.2d 1346, 1354 (D.C. Cir. 1986).  The D.C. Circuit has refrained from interceding in cases where the agency has demonstrated progress in carrying out its responsibilities.  *See id.* (rejecting mandamus relief where the agency had prescribed certain overdue fuel economy standards and had "made some progress" on another); *TRAC*, 750 F.2d at 72 (declining to grant mandamus relief "because the agency has assured us that it is now moving expeditiously"); *cf. Am. Hosp. Ass'n*, 812 F.3d at 193–94 (observing that, on remand, the district

court might conclude that a writ of mandamus is "premature" if "Congress and the Secretary are making significant progress towards a solution"). This court does the same, for now.

### 4.        *TRAC Factor Six:  Agency Intent*

The final *TRAC* factor is less a factor than a reminder that a finding of bad faith is not a prerequisite to compelling agency action. In any event, the court finds no bad faith on the part of the Secretary at this juncture.

*        *        *

In the end, consideration of the *TRAC* factors does not, at this time, warrant interfering with the Secretary's efforts to disburse the balance of Title V monies to Tribal governments. But that does not mean the Secretary enjoys an indefinite period to carry out Congress's command. Plaintiffs may renew their motion should the Secretary's failure to distribute the remaining Title V funds persist for much longer. The court will not set a firm date to complete that task. However, should the Secretary's delay verge on doubling the time Congress mandated to fully disburse Title V funds to Tribal governments, then the question of egregiousness becomes a closer one than it is today. The months-long delay alluded to in the Declaration of Karen Fierro, ECF No. 28, will not be acceptable.[4]

In the interim, the court will require the Secretary to file updates at regular intervals about the progress he is making towards paying the remaining $3.2 billion. The first status report shall be filed by May 15, 2020.

---

[4] Less than a half hour before the start of the hearing on Plaintiffs' motion, Plaintiffs filed the Declaration of Karen Fierro, the Self-Governance Director for Plaintiff Ak-Chin Indian Community. *See* Decl. of Karen Fierro, ECF No. 28. In her Declaration, Fierro states that, on May 7, 2020, she participated in a conference call hosted by the White House in which Daniel Kowalski spoke on behalf of the Secretary and made representations about the additional time it would take to distribute the remaining Title V funds. Fierro Decl. ¶¶ 4, 9–11. According to Fierro, Kowalski said it could take another "two months." *Id.* ¶ 12. Because of the Fierro Declaration's late filing and Defendant's lack of opportunity to respond to it, the court has not considered its representations in evaluating Plaintiffs' motion.

**IV.**

For the foregoing reasons, the court denies, without prejudice, Plaintiffs' Amended Motion

for a Temporary Restraining Order and Preliminary Injunction, ECF No. 12.

Dated:  May 11, 2020

_____
Amit P. Mehta
United States District Court Judge

16